UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DANIEL GIBSON,<br><br>    Plaintiff,<br><br>    v.<br><br>M&M SERVICE STATION EQUIPMENT<br>SPECIALIST, INC. a/k/a M&M SERVICE,<br>INC.,<br><br>    Defendant. | Case No. 1:06-cv-00861-SEB-DML |

## Order Denying in Part and Granting in Part M&M Service Station Equipment Specialist, Inc.'s Motion for Summary Judgment

This cause is before the Court on Defendant M&M Service Station Equipment Specialist, Inc.'s ("M&M Service") Motion for Summary Judgment. Plaintiff Daniel Gibson brought his claim against M&M Service, his former employer, for its alleged discrimination based on his disability, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (ADA). Gibson also alleges that M&M Service interfered with his receipt of group health insurance benefits for a surgery in violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1140 *et seq.* ("ERISA"). M&M Service has moved for summary judgment on both claims. For the reasons detailed below, the court *DENIES IN PART* and *GRANTS IN PART* M&M Service's Motion for Summary Judgment.

# I.

# Factual Background

## A. Parties

### 1. M&M Service

M&M Service is a maintenance company that sells, installs, and services petroleum dispensing and related equipment throughout the Midwest. M&M Service's typical customers are convenience stores and service stations. M&M Service's largest customer is Speedway, and it comprises 65-80% of M&M Service's business. M&M Service employs service technicians at many branch warehouse locations, including Indianapolis. (*Deposition of Mickey Meyer* ("Meyer Dep.") at 9-10, 14-15).

At the times relevant to this case, M&M Service's Vice President, Mickey Meyer, worked at the company's headquarters in Silver Grove, Kentucky. He handled hiring, performance evaluation, discipline, and termination decisions. (*Meyer Dep*. at 4). Steve Carter served as Service Manager and also worked in Silver Grove. He was responsible for dispatching calls to each branch's lead service technicians, who then dispatched field technicians to service stations. (*Deposition of Steve Carter* ("Carter Dep.") at 6).

John Childes was the branch manager of the Indianapolis warehouse and was responsible for inventory and customer contact. (*Deposition of John Childes* ("Childes Dep.") at 5). The Lead Technician in Indianapolis was Robert Sylvester. (*Deposition of Robert Sylvester* ("Sylvester Dep.") at 4).

    **2. Gibson**

Mr. Gibson began working for M&M Service as a service technician in late April 2002. He worked out of the Indianapolis warehouse and performed service tasks for customers of M & M Service, primarily related to petroleum pump maintenance and installation. (*Meyer Dep*. at 7, 9). His job assignments came from either Sylvester or Carter. (*Gibson Dec*. ¶ 11).

  **B. Gibson's Performance and Job Adjustments**

According to Meyer, in May 2005, a Speedway supervisor contacted Meyer and Childes regarding Gibson and told them he preferred that Gibson not service Speedway's stations anymore. (*Meyer Dep*. at 15-17).

Without the Speedway service work, M&M Service did not have enough work available from its other clients to keep Gibson busy full-time as a service technician. Meyer therefore created a part-time warehouse position for Gibson where he worked approximately 20 hours a week and was responsible for maintaining and organizing the parts inventory. The remainder of Gibson's work day was to be spent responding to service calls for customers other than Speedway. (*Meyer Dep*. at 13-15, 21).

  **C. Gibson's Medical Issues and Disclosures to M&M Service**

In late 2004, Gibson and his family had begun participating in a research study by the University of Cincinnati to determine whether brain aneurysms are genetic. One of his sisters recently had been hospitalized because of a stroke caused by an aneurysm. (*Gibson Dec*. ¶ 12).

Gibson revealed to Carter and Childes that he was participating in the study. He also told Carter that he had family members who passed away from aneurysms. Gibson told Sylvester that the University wanted also to test his son Donald, who worked for M&M Service as well.

(*Gibson Dec*. ¶¶ 16-18). Gibson "talked about it a lot" and talked to "everybody" about it. (*Sylvester Dep*. at 25).

On September 6, 2005, Gibson received a call from his physician informing him that he had brain aneurysms, needed to see a brain specialist, and was going to need surgery. (*Gibson Dec*. ¶ 22). When Gibson ended the call, he walked into the office and told Sylvester, Childes, and two other employees in the room that he had aneurysms. Gibson also called Carter at the Silver Grove office and told him that he had aneurysms and needed surgery. (*Gibson Dec*. ¶¶ 23, 25).

Gibson testified that he may have at one time mentioned to Meyer that his sister was recovering from a stroke and his family was involved in testing, but that he never told Meyer directly that he had brain aneurysms. (*Gibson Dec*. ¶ 20). According to Meyer, no one else from the Indianapolis branch location told him about Gibson's condition, testing, diagnosis, or his need for surgery. (*Meyer Dep*. at 36). Meyer has denied that he ever had knowledge of any of Gibson's medical problems. (*Meyer Dep*. at 36).

### D. Gibson's Layoff

As noted above, in May of 2005, Gibson had begun working partly in the warehouse and partly doing service calls. (*Gibson Dec*. ¶ 19). In September of 2005, M & M Service laid Gibson off. Meyer has testified that he decided to lay Gibson off sometime before September (*Meyer Dep*. at 27, 34), and that he made that decision after Carter showed him Gibson's timesheets, which demonstrated to him that Gibson was not working full days. (*Meyer Dep*. at 25-26). Carter's regular practice was to show Meyer any employee's time sheet who did not work a full day. Carter, however, could not remember whether he had shown Meyer any of Gibson's timesheets, and he did not remember anything irregular about them. (*Carter Dep*. at

4

11). Gibson has testified that he worked approximately 50 hours per week and as much as 80 hours per week during this period. (*Gibson Dec.* ¶ 19).

Meyer and Sylvester both testified that they met in Silver Grove in early September and that they discussed discharging Gibson at that meeting. (*Meyer Dep*. at 27, 29; *Sylvester Dep*. at 27-28). Sylvester initially testified he was certain that they had met on September 1, because his timesheet showed that he was in Silver Grove that day. (*Sylvester Dep*. at 17, 20). A timesheet from September 7, however, showed that Sylvester was also in Silver Grove on that day. (*Sylvester Dep*. at 27-28; *Dep. Ex*. 33). Sylvester concluded he was "pretty sure" the date he met with Meyer to discuss Gibson was September 1. The only frame of reference Meyer had for when he decided to lay off Gibson was when he talked to Sylvester. (*Meyer Dep*. at 27-29).

On September 9, 2005, Carter traveled to Indianapolis to lay off Gibson. (*Carter Dep*. at 15-17). Meyer had asked Carter to tell Gibson of his discharge because of the good relationship the two had. Carter, however, was not involved in the decision to lay off Gibson. (*Meyer Dep*. at 32-34). Carter met with Sylvester, and then the two told Gibson of the decision. (*Carter Dep*. at 16-17).

### E. COBRA Coverage Problems

M&M Service offered an employee benefit plan from Humana Insurance Company of Kentucky ("Humana") that provided group health insurance coverage. M&M Service elected to continue benefits for an employee through the end of the month in which employment ended. (*Affirmation of Sherrie Keller* ("Keller Aff."), ¶¶ 5-7).

When an employee left the company, Lisa Macke, an employee at company headquarters, sent that person a COBRA continuation coverage form. She had used the same form throughout the time she worked at M&M Service. The form contains an acknowledgement that employees

must timely pay premiums for the coverage to continue. The form provided that the employee should mail it to M&M Service, and it contained the mailing address. A former employee would have to pay the premium to purchase the COBRA policy and pay the premium prior to the month for which the employee wanted to continue coverage. (*Deposition of Lisa Macke* ("Macke Dep."), at 5, 44-46, 53).

M&M Service notified Humana of Gibson's layoff on September 9. (*Macke Dep*. at 10-11). Under M & M Service's plan, Gibson's coverage was to remain in place until September 30, 2005. (*Macke Dep*. at 11-12, 18). M&M Service also informed Gibson of his right to enroll in continuation coverage under the policy, in accordance with COBRA. M&M Service's COBRA enrollment form informed Gibson that he was allowed 60 days from October 15, 2005, to enroll in continuation coverage. (*Macke Dep*. at 33, 44, 47).

On September 21, 2005, Gibson met with a neurosurgeon, and he underwent surgery for his aneurysms in late October 2005. On October 21, 2005, Gibson learned that his health insurance benefits had been terminated on September 9, 2005, the day of his lay off. Humana had denied coverage for any of the medical costs associated with his surgery and post-surgery treatment. (*Gibson Dep*. at 68-69, 78-80, 85).

The information form Gibson received from M&M Service regarding COBRA coverage contained the wrong mailing address and the wrong phone number for contacts and questions. (*Macke Dep*. at 44-46, 53). When Gibson phoned the number on the form to inquire about COBRA coverage, he learned that the recipient had nothing to do with COBRA coverage. When Gibson phoned M&M Service's main number to ask about COBRA coverage, he was told it was probably too late for him to obtain it. (*Gibson Dec*. ¶¶ 33-34).

Gibson contacted the Department of Labor after he had not been able to speak with anyone at M&M Service about COBRA. The Department of Labor conducted a telephone conference between Gibson and M&M Service employee Macke. Macke first told the Department of Labor representative that the time had passed for Gibson to get COBRA continuation coverage, but after being told of the error in contact information, Macke gave Gibson an address where he could send his COBRA form. (*Gibson Dec.* ¶ 35).

On November 12, 2005, Gibson sent his COBRA paperwork to the address Macke had provided, and a person in M&M Service's office signed for it on November 14. M&M Service misplaced the form, however, and did not forward it to Humana. (*Macke Dep.* at 33-35). But M&M Service quickly found the form when Humana called to ask for it in response to a complaint that Gibson had filed with the Department of Insurance. M&M Service faxed the enrollment form to Humana on the same day it called. (*Macke Dep.* at 26-27; *Keller Dep.* at 27-29).

Humana treated Gibson as if he had had no lapse in coverage and paid his medical claims. (*Keller Aff.* at 9, 10). M&M Service initially paid Gibson's COBRA premium, and Gibson paid M&M Service in January 2006 for his October, November, and December premium payments after the resolution of his insurance complaint. (*Gibson Dec.* ¶ 39).

## II.

## Legal Analysis

### A. Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material

facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255.

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (internal quotations omitted). The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove any single essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, if speculative or lacking a foundation of personal knowledge and unsupported by specific concrete facts reflected in the record, cannot defeat

8

summary judgment.  *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc*., 987 F.2d 1293, 1295 (7th Cir. 1993).  Neither the "mere existence of *some* alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Ill., Inc*., 209 F.3d 687, 692 (7th Cir. 2000).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available.  *Seener v. Northcentral Technical Coll*., 113 F.3d 750, 757 (7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc*., 94 F.3d 353, 354 (7th Cir. 1996); *Stumph v. Thomas Skinner, Inc*., 770 F.2d 93, 97 (7th Cir. 1985) (summary judgment "notoriously inappropriate" where intent is at issue). To that end, we carefully review the record for circumstantial evidence which, if believed, would demonstrate discrimination.  The Seventh Circuit has also made clear, however, that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc*., 109 F.3d 406, 410 (7th Cir. 1997).

### B.  Gibson's ADA Claim

Gibson contends he was terminated because he was regarded as having a disability, in violation of the ADA.  Under the ADA, employment discrimination "against a qualified individual with a disability because of the disability" is prohibited.  42 U.S.C. § 12112(a); *Furnish v. SVI Sys., Inc.*, 270 F.3d 445, 448 (7th Cir. 2001).  It is the plaintiff's burden to prove that he is a "qualified individual" under the ADA, to wit, that he is "an individual with a

disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that [he] holds or desires." *Weiler v. Household Fin. Corp*, 101 F.3d 519, 524 (7th Cir. 1996) (quoting 42 U.S.C. § 12111(8)). Therefore, before the Court considers Gibson's claim under the ADA for discriminatory termination, it must first assess whether Gibson was disabled within the meaning of the ADA.

Under the ADA, an individual has a "disability" if: (1) he has a physical or mental impairment that substantially limits one or more of her major life activities; (2) he has a record of such an impairment; or (3) his employer regards him as having such an impairment. 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g).[1] Here, Gibson argues only that M&M Service regarded him as disabled in the major life activity of working. It is not enough for Gibson to show that M&M Service was aware of his impairment; instead, Gibson must show that M&M Service knew of the impairment and believed that he was substantially limited because of it. *See Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 950 (7th Cir. 2000).

In this case, the same body of evidence Gibson relies upon to show discrimination also bears on the issue of whether M & M Service regarded him as disabled. The Court will therefore address that evidence for purposes of both contexts.

A plaintiff may prove discrimination in violation of the ADA using one of two methods. *Timmons v. General Motors Corp.*, 469 F.3d 1122, 1126 (7th Cir. 2006). Under the "direct" method, the plaintiff may provide either direct or circumstantial evidence that points to a

---

[1] On September 25, 2008, Congress amended the ADA's definition of disability. *See* § 3 of the ADA Amendments Act of 2008 (September 25, 2008). However, Section 8 of this statute provides that the legislation's effective date is January 1, 2009. Therefore, the new definition does not apply here because we "use the laws and interpretations that were in force when the complained-of acts occurred." *Kiesewetter v. Caterpillar, Inc.*, 2008 WL 4523595, at *1 (7th Cir. October 9, 2008) (citing *Landgraf v. USI Film Products*, 511 U.S. 244 (1994)).

conclusion that the employer acted as it did for illegal reasons. *Id*. The alternative way to prove discrimination is the burden-shifting *McDonnell Douglas* method. *Id*.; *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Gibson proceeds under the direct method. Under that method, the distinction between direct and circumstantial evidence is "vague," 1 John H. Wigmore, *Evidence* § 25, at p. 953, but even more important, it is irrelevant to assessing the strength of a party's case. *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006). The direct method can indicate discrimination if the trier of fact can *infer* intentional discrimination. *Culver v. Gorman & Co., Inc*., 416 F.3d 540, 546 (7th Cir. 2005).

The Court finds that genuine issues of material fact as to M&M Services' contention that it did not regard Gibson as disabled and as to its proffered reason for discharge. First, the evidence in the record creates a dispute about whether Meyer knew of Gibson's condition and whether the reason he offered for discharging Gibson is true. "Because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes summary judgment." *Zaccagnini v. Chas. Levy Circulating Co*., 338 F.3d 672, 676 (7th Cir. 2003) (quoting *Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995)). Even if the plaintiff's evidence does not compel the conclusion that his employer discriminated against him, "if there is a question of fact as to the believability of an employer's purported reasons for an employment decision" then "at a bare minimum it suffices to defeat the employer's summary judgment motion." *Rudin v. Lincoln Land Cmty. Coll*., 420 F.3d 712, 726 (7th Cir. 2005) (internal citation and internal quotation marks omitted).

The only reason Meyer advanced for discharging Gibson was that Gibson's hours were lower than the required number of hours. Meyer testified that he came to that conclusion only

after Carter showed Gibson's timesheets to him, and he testified that Carter showed him the timesheets because Carter saw that Gibson was not working full days.  Gibson, however, has testified that he often worked more than 50 hours, and sometimes close to 80 hours per week.  In light of Carter's testimony that he did not remember discussing Gibson's timesheets with Meyer or even anything unusual about them, a disputed issue of fact exists regarding the reason why Meyer laid off Gibson.

The second genuine issue of material fact is raised by the timing of Meyer's decision.  Suspicious timing is a type of circumstantial evidence considered when using the direct method of proving discrimination.  *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506 (7th Cir. 2004).  Although temporal proximity is not enough by itself to create an issue of material fact, it could suffice where the adverse action followed on the heels of the employer's discovery of the perceived disability.  *Id*. at 506-07.

As with the first issue, the evidence creates a dispute about when Meyer found out that Gibson had aneurysms.  Gibson has testified that he told Meyer in July or August 2005 that his sister had had a stroke and that he was getting tested for aneurysms.  He also told many people at work about getting tested for the aneurysms and, later, that he needed surgery.

Meyer testified that he decided before September 1 to lay off Gibson and that he communicated this decision to Sylvester when Sylvester visited the Silver Grove office.  Neither Meyer nor Sylvester could remember the specific date, but knew from reviewing Sylvester's time cards that it was the beginning of September.   Sylvester, however, had been to Silver Grove on both September 1 and 7.  The significance of when Meyer communicated the decision to Sylvester is that Gibson learned on September 6 that he was going to need surgery for aneurysms and he communicated that to Carter in the Silver Grove office and to employees at the

Indianapolis branch. If it was September 7—a time at which "everybody" was talking about Gibson's aneurysms—a fact-finder could infer that Meyer decided to terminate Gibson immediately upon learning of his condition. Other circumstantial evidence that would permit an inference that Meyer knew of Gibson's condition when he made his decision includes the uncontroverted fact that several employees in the Indianapolis branch and a key employee at the same office as Meyer (Carter) knew about Gibson's condition, and the proximity of three days between Gibson telling employees of his condition and the date he was terminated.

This Court recognizes that Meyer has consistently maintained that he did not know of Gibson's diagnosis of aneurysms until after he had made the decision to lay him off. And the evidence that would support a contrary conclusion is indeed very slight. It nevertheless precludes entry of summary judgment. Accordingly, this Court DENIES M&M Service's Motion for Summary Judgment on Gibson's ADA claim.

### C.  Gibson's ERISA Claim

Gibson alleges that his termination violated ERISA § 510, 29 U.S.C. § 1140. That section provides that an employer cannot take any action to prevent someone from exercising benefits to which he is entitled under a group plan. It also specifies that ERISA § 502, 29 U.S.C. § 1132, provides the enforcement terms of Section 510. Even assuming the truth of Gibson's allegations about the violations of ERISA § 510, he is not entitled to relief because Section 502 does not allow him to recover his legal damages.

> Section 502 of ERISA provides, in pertinent part:
>
> (a)   Persons empowered to bring a civil action
>
> A civil action may be brought –
>
> 1)   by a participant or beneficiary –

13

>> (A) for the relief provided for in subsection (c) of this section, or
>> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
>
> …
>
> 3) by a participant, beneficiary, or fiduciary
>
>> (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter or the terms of the plan;…

The Seventh Circuit has observed that the text of Section 502 is "uncomplicated: Each subsection identifies explicitly the ERISA entities that may enforce rights under the statute in a civil action, what sort of rights are enforceable by each party and what relief may be sought." *Northcutt v. General Motors Hourly-Rate Employees Pension Plan*, 467 F.3d 1031, 1036 (7th Cir. 2006). *Northcutt* also notes that the United States Supreme Court has recognized the exclusivity of the judicial remedies the ERISA enforcement scheme provides and has cautioned that courts ought to be "reluctant to tamper with an enforcement scheme crafted with such evident care." *Id*. (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985)). The Supreme Court has repeatedly declined permit judicial remedies not specifically authorized by the language of the statute. *Northcutt*, 467 F.3d at 1036 (citing *Great-West Life & Annuity Ins*., 534 U.S. 204, 209-10 (2002)).

Gibson recognizes that his request for reinstatement and back pay are legal damages and not recoverable under Section 502. He attempts to circumvent the clear statutory text by arguing that this court should treat back pay as equitable relief because Congress included it in a listing

14

of equitable remedies for purposes of Title VII of the Civil Rights Act of 1964. The Supreme Court, however, specifically rejected that argument in *Great-West*. 534 U.S. at 218 n.4.

A Sixth Circuit decision provides more specific instruction. In *Allinder v. Inter-City Products Corp.*, 152 F.3d 544, 553 (6th Cir. 1998), the court rejected a plaintiff's claim for compensatory damages against her employer for its failure to complete a form necessary for the plaintiff to file a disability claim. *Id*. at 545-46. The court reasoned that equitable relief is limited to remedies traditionally viewed as equitable, such as an injunction or restitution, but not money damages. *Id*. at 552-53. This court finds the Sixth Circuit's reasoning in accord with the Seventh Circuit's recognition that courts must not expand the remedies available under Section 502.

The relief Gibson has requested under ERISA simply is not available. This court therefore GRANTS M&M Service's Motion for Summary Judgment on Gibson's ERISA claim.

## III.
## Conclusion

For the foregoing reasons, this Court *DENIES IN PART* and *GRANTS IN PART* M&M Service's Motion for Summary Judgment. This Court DENIES M&M Service's Motion for Summary Judgment as to the ADA claim, but GRANTS M&M Service's Motion for Summary Judgment as to the ERISA claim.

Date:  03/30/2009

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Andrew W. Hull
HOOVER HULL LLP
awhull@hooverhull.com

Kimberly Denise Jeselskis
MACEY SWANSON AND ALLMAN
kjeselskis@maceylaw.com

Barry A. Macey
MACEY SWANSON AND ALLMAN
bmacey@maceylaw.com

Laurie E. Martin
HOOVER HULL LLP
lmartin@hooverhull.com

Alice McKenzie Morical
HOOVER HULL LLP
amorical@hooverhull.com

Jeffrey D. Roberts
HOOVER HULL LLP
jroberts@hooverhull.com